UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Case No. 10 Civ. 6523 (RJS)

IN RE DG FASTCHANNEL, INC.
SECURITIES LITIGATION

JURY TRIAL DEMANDED

CLASS ACTION

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

LABATON SUCHAROW LLP
Christopher Keller
Jonathan Gardner
Mark S. Goldman
Angelina Nguyen
140 Broadway
New York, New York 10005
Tel: 212-907-0700
Fax: 212-818-0477

Lead Plaintiff Norfolk County Retirement System ("Plaintiff" or "Norfolk"), by its undersigned attorneys, hereby brings this Consolidated Amended Class Action Complaint ("Complaint") against DG Fastchannel, Inc. ("DG" or the "Company"), Scott K. Ginsburg ("Ginsburg"), Neil H. Nguyen ("Nguyen"), and Omar A. Choucair ("Choucair"). The allegations herein are based on Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of its counsel, which included interviews of former employees of DG and other persons with knowledge of the matters alleged herein (some of whom have provided information in confidence; these confidential witnesses ("CWs") will be identified herein by number (CW1, CW2, etc.)), review and analysis of publicly available information, including United States Securities and Exchange Commission ("SEC") filings by DG, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and consultations with experts. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of itself and the class it seeks to represent, Plaintiff alleges as follows:

## NATURE OF THE ACTION

1.     This action is brought on behalf of a class of purchasers of DG's publicly traded securities between August 4, 2010 and August 27, 2010 inclusive (the purchasers being the "Class" and the time frame being the "Class Period"). Lead Plaintiff seeks remedies under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq. (the "Exchange Act").

2.     DG FastChannel, Inc. (since rebranded as DG) is a provider of digital technology services that enable the electronic delivery of advertisements, syndicated programs, and video

news releases to traditional broadcasters, online publishers and other media outlets.  DG provides

primarily electronic physical distribution of broadcast advertising content to broadcast stations

throughout the United States and Canada. DG operates a digital network that connects more than

5,000 advertisers and advertising agencies with approximately 4,500 television, cable and

network broadcast destinations. The network routes transmissions via satellite to stations through

an automated online transaction and delivery system, enabling rapid delivery of advertising

content.  DG equips broadcast stations with, and maintains, servers that are designed to receive

and play back the material delivered through its digital distribution network.

3.      The majority of DG's revenue derives from the delivery of commercials (known

as spot television advertising) to broadcast stations, in both Standard Definition ("SD") and High

Definition ("HD") format.[1]  DG charges a fee per delivery, and tracks revenue daily through a

report-generating system that circulates reports to the entire executive team including

Defendants.  The daily revenue report is broken down into three categories:  spots (*i.e.*,

commercials), deliveries, and orders (both SD and HD), and internal trend analysis reports were

also circulated regularly.  In other words, DG is able to (and did) track its revenues in real-time,

as each advertisement is delivered.  DG charges a premium for HD delivery, for which

customers pay almost ten times the cost of SD delivery.  HD delivery is also the part of the

industry that represents the biggest and fastest growth, as only 10% or so of broadcast stations

are equipped to receive and broadcast HD material.

4.      DG's core customers comprise brand advertisers and advertising agents who act

on behalf of brand advertisers.  The relative volumes of advertisements that DG distributes

---

[1]  In addition, DG also delivers television programming in both SD and HD format through its Pathfire subsidiary, and refers to this service as "long-form" programming distribution, distinguishable from its commercial or "short-form" delivery service.  DG also has subsidiaries that handle Internet and infomercial advertising.

represent the five leading national advertising categories of automotive, retail, business and consumer services, food and related products and entertainment.

5.      Ginsburg, who has been CEO for seven years and Chairman of DG for over ten years, has multiple other business and personal interests.  Ginsburg is the owner of Boardwalk Auto Group, a chain of luxury automobile dealerships in Texas, comprising Porsche, Audi, Volkswagen, Ferrari, Maserati and Lamborghini.  Ginsburg recently expanded his auto empire by acquiring a Ferrari/Maserati dealership in San Francsico, CA.  Under Ginsburg's direction, Boardwalk Auto Group has flourished, and is one of the fastest growing privately held companies in Dallas-Fort Worth.  Ginsburg has also spent considerable time serving on the boards of directors of the Dallas Symphony, the Dallas Arboretum, and various private schools.

6.      DG has historically countered competition by aggressively acquiring its competitors (including of FastChannel Network, Inc. ("FastChannel")), and was until recently able to enjoy a virtual monopoly of both core advertising clients and pricing.  The rapid growth of HD, however, has increasingly attracted other companies, both new and established, into the ad delivery industry.  By the first half of 2010, industry analysts and the market were increasingly aware that competition would seriously affect DG's monopoly on clients and pricing – it was only a matter of when.

7.      In late 2009 and early 2010, however, DG did not yet feel the impact of competitors entering into its core ad delivery business – DG still possessed a large and diverse client base, with no single customer accounting for more than 10% of annual revenue, and by virtue of its near monopoly over the industry, was in a position to dictate pricing.  With its higher margin HD business taking off, the economy beginning to recover from the recession of 2008-2009 companies again ramping up their advertising, DG was somewhat insulated from

competition by its diverse client base (which would cushion DG's revenues from account defections to competitors).  DG was, therefore, still able to maintain virtual monopoly pricing on its SD and HD ad delivery business, notwithstanding the efforts of new, less established competitors to take away business.  DG also stood to benefit from lucrative advertising opportunities from the upcoming political elections.  Thus, the time was right for Ginsburg – increasingly focused on his other business and social interests – to divest out of DG while its stock price was at all-time highs.

8.    From December 2009 to the beginning of August, 2010, Ginsburg sold, astoundingly, *over 1.1 million* DG shares for proceeds of more than *$55 million*.

9.    Ginsburg's plan to divest a significant portion of his DG holdings at maximum profit[2] while the Company's stock traded at all-time highs, however, ran into obstacles.  By the start of the third quarter of 2010, if not earlier, DG began to experience (1) the defection of several blue-chip customer accounts to competitors like Extreme Reach, a privately held company run by former executives of FastChannel; (2) the undercutting of its prices by competitors, forcing DG to slash its own prices in an attempt to retain customers; (3) the concomitant loss in revenue from the price cuts; and (4) a marked slowdown in ad spending by the automotive and entertainment industries.

10.    Because of its real-time revenue-tracking ability, Defendants were aware that DG's third quarter revenue was going to be much lower than what analysts had predicted.  DG's usual practice was not to give financial guidance, but to endorse analysts' consensus estimates. Even though Defendants knew in July 2010 that third quarter revenues were going to be lower

---

[2] Ginsburg has a prior history of insider trading.  On March 19, 2004, the United States Court of Appeals for the Eleventh Circuit reinstated a jury verdict against Ginsburg for insider trading in violation of the federal securities laws.  The Court of Appeals also reinstated a $1 million civil penalty and ordered the district court to impose a permanent injunction from future violations. *See Securities and Exchange Commission v. Scott K. Ginsburg*, No. 03-10848 (11th Cir. March 19, 2004).

than the market had been led to believe, Defendants failed to correct analysts' estimates when they released and discussed DG's second quarter earnings on August 4, 2010.  When asked directly how the third quarter was tracking, Ginsburg stated that Company's "perspective on Q-3 is very positive," and that due to a "robust" advertising environment, "we expect that we'll do extremely well."  Ginsburg further fanned analysts' expectations that the Company would continue to do well financially by emphasizing that "2010 has been a better year for advertising than 2009," with the Company anticipating a large share of the fall political ads, HD adoption continuing to increase, and only positive signs from the market.  In reaction to Ginsburg's statements, analysts enthusiastically raised their estimates for the third quarter.

11.     Similarly, addressing the issue of competition at an August 10, 2010 investor conference, Ginsburg stressed that "we have a dominant position and we'll be able to maintain it for a period of time," and proclaiming that "[w]e have a very good long-term relationship across our blue chip customer base."  When asked about pricing pressure from competitors, Nguyen stated "the [C]ompany has done really well. Overall, we renewed a number of our contracts with each one of our major advertisers and continue to have support from all the top agencies and advertisers."  Ginsburg added that "we're going to have stellar growth again this year," and "the [C]ompany is doing extremely well and we expect it to do extremely well."

12.     In the third week of August, the Defendants were still sticking with their false story that third quarter business was robust.  In response to an analyst's query Choucair "was adamant about business conditions  remaining strong."

13.     Even though ad sales increased somewhat in August, by the end of the month it was clear to Defendants that – largely due to the slowdown in July – third quarter revenues were going to be much lower than analysts' published estimates, which had been raised following the

second quarter earnings call on August 4.  In one more attempt to keep DG's stock price artificially inflated, Defendants aimed to temper their long overdue "revised" guidance by announcing a significant stock buy-back at the same time, even though the Company had only recently completed a secondary stock *offering* in April 2010, and by timing both announcements for August 30, 2010 – *before* third quarter results would be released and discussed.

14.    Defendants' attempt failed.  The market, stunned by the abrupt about-face by Defendants from their previously glowing assessments in early August, only a few weeks before, sent the Company's stock price plummeting from $24.54 at the close of business on August 27, 2010 to $15.11 at the close of business on August 30, 2010, or 38.43%, on unusually heavy volume.  Not surprisingly, Ginsburg has refrained from selling his remaining stock at the stock's uninflated price.

## JURISDICTION AND VENUE

15.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

17.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud, including the dissemination to the public of materially false and misleading statements, and/or the effects of the alleged fraud, have occurred within this District.  In addition, at all relevant times DG's shares were offered, sold, and traded on the Nasdaq National Market ("NASDAQ") in this District, and the Company has regional offices in New York City at 600 Third Avenue, NY, NY 10016 and 205 West 39th Street, NY, NY 10018.

18.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

19.     On November 24, 2010, the Court appointed Norfolk to serve as Lead Plaintiff in this consolidated securities class action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 77z-1.

20.     Lead Plaintiff Norfolk is an institutional investor that provides retirement benefits to 9,500 active and retired government employees of forty governmental units and is one of the largest public retirement systems in the Commonwealth of Massachusetts. Norfolk manages more than $450 million in assets.  As set forth in the certification annexed to Norfolk's Motion for Appointment as Lead Plaintiff, incorporated by reference herein, it purchased the common stock of DG on the open market during the Class Period and suffered damages as a result of the misconduct alleged herein.

21.     Defendant DG is a Delaware corporation with principal executive offices located at 750 West John Carpenter Freeway, Suite 700, Irving, Texas 75039.  DG provides digital technology services that enable the electronic delivery of advertisements, syndicated programs, and video news releases to traditional broadcasters, online publishers and other media outlets. DG's securities, at all times relevant here, traded on the NASDAQ under the ticker symbol "DGIT."

22.     Defendant Ginsburg has served as the Company's Chairman of the Board since December 1998 and Chief Executive Officer ("CEO") since November 2003. Ginsburg was a direct and substantial participant in the fraud.

23.     Defendant Nguyen has served as the Company's President and Chief Operating Officer ("COO") since September 1, 2009, and has been a Director since January 11, 2010.  He previously served as the Company's Executive Vice President of Sales and Operations March 2005 through August 2009.   Nguyen was a direct and substantial participant in the fraud.

24.     Defendant Choucair has served as the Company's Chief Financial Officer ("CFO") since July 1999, and has been a Director since November 2000.  Choucair was a direct and substantial participant in the fraud.

25.     Defendants  Ginsburg, Nguyen and Choucair are collectively referred to as the "Individual Defendants."  The Individual Defendants, together with DG, are collectively referred to as the "Defendants."

## CONTROL PERSON ALLEGATIONS

26.     The Individual Defendants, because of their positions of control and authority as senior executive officers and Directors, had access to the adverse, undisclosed information about DG's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

27.     Each of the above officers of DG, by virtue of his high-level position with the Company, directly participated in the management of the Company, and was directly involved in the day-to-day operations of the Company at the highest levels.  The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Customer demand for the Company's core products, including electronic

delivery of SD and HD commercials to television broadcast stations, were fundamental, core aspects of DG's business and subjects that the Individual Defendants followed, tracked, and were aware of at all times.

28.    The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance or had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

29.    As senior officers and controlling persons of a publicly-held company whose securities were, during the relevant time, registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

30.    Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of DG's securities during the Class Period, which included the dissemination of materially false and misleading statements regarding competition from other companies in SD and HD delivery of

commericals, downward pricing adjustments on DG's delivery prices and decrease in sales as a result of increased competition, the concomitant loss of market share to those competitors, and concealment or omission of material adverse facts.  The scheme: (i) deceived the investing public regarding DG's operations and business, and the true value of DG's securities; and (ii) caused Plaintiff and other members of the Class to purchase DG's securities at artificially inflated prices, which fell as the truth concerning DG ultimately became known.

31.     In making the statements complained of herein, the Individual Defendants, who were all senior officers and controlling persons of DG, were acting on behalf of the Company in the regular course of business.  Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## SUBSTANTIVE ALLEGATIONS

### The Company and its Business

32.     DG is a leading provider of digital technology services that enable the electronic delivery of advertisements, syndicated programs, and video news releases to traditional broadcasters, online publishers and other media outlets.  The Company operates three nationwide digital networks out of Network Operation Centers ("NOCs") located in Irving, Texas, Atlanta, Georgia, and Jersey City, New Jersey, which link more than 5,000 advertisers, advertising agencies and content owners with more than 23,000 radio, television, cable, network and print publishing destinations and over 5,000 online publishers electronically throughout the United States, Canada, and Europe. Through the NOCs, DG delivers video, audio, image and data content that comprise transactions among advertisers, content owners, and various media outlets, including those in the broadcast industries.

33.     DG delivers advertising content electronically via the Internet and satellite transmissions.  The amount of advertising content transmitted electronically in the industry (compared with the traditional "dub and ship" method on analog tape) comprises approximately 60% of video spots, and continues to increase.

34.     DG's digital network connects more than 5,000 advertisers and advertising agencies with approximately 4,500 television, cable and network broadcast destinations.  The digital network delivers near master quality video and audio to broadcasters, routing transmissions to stations through an automated online transaction and delivery system, and enabling delivery in as little as one hour after an order is received.  DG touted that its rapid delivery gave it an advantage to customers with particular time-sensitive delivery needs, such as political candidates and issue groups during election campaigns.

35.     DG delivers ads in both high-definition ("HD") and standard-definition ("SD") format.

36.     DG's fiscal year ends on December 31, so that its quarterly reports track those of the calendar.

**The Delivery Process**

37.     DG receives video content electronically from its clients via its proprietary file transfer software deployed in post production studios.  DG conducts a quality control of the content, digitizes the material and uploads the content to a NOC, where it is combined with the customer's electronic transaction to transmit the various combinations of video to designated television stations. Video transmissions are sent via a high-speed fiber link to the digital satellite and then delivered directly to Company-owned servers called DG FastChannel HD Xtreme™ servers, that are placed in television stations and cable interconnects.

38.     Designated television stations receive the video transmissions on DG Spot Boxes, Client Workstations and Digital Media Managers. The DG servers enable stations to receive and play back material delivered through DG's digital distribution network.  DG owns all the equipment it places at the receiving television stations and typically installs the equipment in the master control or production area of the stations. Upon receipt, station personnel review the content and transfer the spot to a standardized internal station and format for subsequent broadcast.

39.     HD transmission required stations to have special HD equipment to both receive and broadcast advertising content.

40.     DG's long-form programming distribution, *i.e.*, the distribution of television shows, works much the same way as its short-form distribution for commercials.  The long-form business operates through DG's wholly-owned Pathfire subsidiary, which uses separate servers and equipment from the short-form business.

**Customers and Pricing**

41.     DG offers various levels of digital video and audio distribution services to advertisers distributing content to broadcasters including: DGFC Priority, guaranteeing arrival of the first spot on an order within one hour; DGFC Express, guaranteeing arrival within four hours; DGFC Standard, guaranteeing arrival by noon the next day; and DGFC Economy, guaranteeing arrival by noon on the second day. DG charges a fee per delivery for its advertising distribution service, based on the service level ordered by the customer; *i.e.*, it receives revenue on a per-transaction basis.  Because DG received full payment each time it delivered an ad, Defendants could track the Company's revenue in real time.

42.     CW1 is a former Business Intelligence Manager/Product Manager who worked at DG from July 2008 through September 2010.  For most of  CW1's tenure, CW1 managed the

Company's business intelligence reporting department.  CW1 confirmed that Defendants tracked the Company's revenue in real time.  According to CW1, the Company generated more then 500 types of reports that were circulated to "C-level" executives on a *daily* basis.  CW1 identified the report-generating system as "SSRS," similar to software developed by PeopleSoft.  CW1 stated that these reports were circulated everyday, to the entire executive team including Defendants, and their delivery was "scheduled."  CW1 explained that the daily report was broken down into three categories:  spots (*i.e.*, commercials), deliveries, and orders (both SD and HD).  CW1 further stated that internal trend analysis reports were also circulated regularly.

43.    CW2 is a former Vice President of Sales for DG, one of three Vice Presidents of Sales employed by the Company for its respective sales regions.[3]  CW2 worked at DG from December 2006 through June 2010, reporting directly to Mike Caprio, Senior Vice President of Sales, who in turn reported directly to Nguyen.  CW2 was part of DG's direct sales force, which calls advertising agencies to promote the advantages of DG's electronic distribution system.  The sales force also calls corporate advertisers who are in a position to either direct or influence agencies in directing deliveries to DG.  A separate sales staff sells to and services audio and video dealers, who resell DG's distribution services. DG has regional sales offices in New York (East), Los Angeles (West) and Chicago (Central).

44.    CW2 also observed that the Company kept track of sales through weekly tallies of customer transactions as well as monthly pipeline reports, in addition to the daily reports observed by CW1.

45.    The relative volumes of advertisements distributed by DG are representative of the five leading national advertising categories of automotive, retail, business and consumer services, food and related products and entertainment.  The volume of advertising from these

_____

[3] According to CW2, DG employs three Vice Presidents of Sales for the East, Central, and West regions.

segments is subject to seasonal variations.  Generally, the fourth quarter of the year is the strongest because of holiday advertising; the first quarter of the year is historically weakest.  No single customer accounts for more than 10% of DG's annual revenue.  This diversity in DG's client base provided it with limited protection from competition, because defecting accounts that left for a competitor would not greatly affect DG's bottom line unless there were a cumulative wave of sudden departures.

46.     DG's main revenue comes from its short-form business, *i.e.*, the delivery of spot ads to broadcast stations.  Its fastest growing segment was the delivery of HD ads.  DG charged a premium for HD delivery – about ten times the cost of SD delivery – meaning much bigger profit margins.  Moreover, the number of stations equipped to receive and broadcast HD material in the first half of 2010 was both small (about 10%) yet steadily increasing, representing a huge potential market.

**DG's Virtual Monopoly**

47.     DG's historic approach to competition was to aggressively acquire its competitors and eliminate the threat.  To that end, from 2005 through 2008, DG acquired Enliven Marketing Technologies Corporation; Media DVX, Inc.; the Vyvx advertising services business of Level 3 Communications, Inc.; Pathfire, Inc; Point.360; GTN, Inc.; and – one of its fiercest competitors – FastChannel Network Inc.

48.     Because of its extensive network, including the placement of proprietary DG equipment in thousands of broadcast stations, and the elimination of its competitors through acquisitions, DG historically enjoyed a virtual monopoly on the ad delivery business, and was able to dictate and control pricing for ad delivery.

49.     By late 2009 and into early 2010, however, the vast potential market for HD was attracting many more competitors to DG's core business, making it impractical for DG to rely on

acquisitions to quell competition.  At the same time, technological advances were making it possible for competitors to use "cloud-based" delivery as an alternative to DG's hardware-based network, comprising proprietary equipment in broadcast stations.  In other words, competitors did not have to build their own hardware networks to compete with DG's established network – they could more cost-effectively upload the advertising material into an online server (*i.e.*, the "cloud") and the broadcasting stations would then download the content into their own server. Although this "pull" method required stations to actively download content into their own servers, as opposed to DG's "push" method of delivery into the station, without having to take up bandwidth or storage space on the station's servers, and was therefore costlier for the stations, the cost savings for competitors enabled them to offer pricing structures for delivery that were lower  DG's.  In other words, the barriers for entry into the business had been lowered.

**DG's Position in Early 2010**

50.     In early 2010, DG still had a vast network and a large, diverse client base. Competition was on the horizon, however – Extreme Reach, a privately held competitor founded by former FastChannel executives, was starting to make inroads into DG's business, and other companies such as Ascent Media and Hula were also applying increasing competitive pressure on DG.  Still, in early 2010 these pressures had not yet forced DG to significantly cut prices.

51.     At the same time, the economy was recovering from the recession in 2008-2009, and companies were starting to spend more on advertising in reaction to the increased spending by consumers.  The Company stood to benefit from the increased ad expenditure, both in terms of overall volume of business and the higher profit margins in the still-untapped HD market.

52.     2010 was also an election year, and the market expected that DG would capitalize on the increased political spending in the third and fourth quarters, though it was recognized that the political advertisements would take the place of other advertisements.

**Ginsburg Seizes the Opportunity and Begins Divesting**

53.     Ginsburg, who by 2010 had been CEO for seven years and Chairman of DG for over ten years, has multiple other business and personal interests.  Ginsburg is the owner of Boardwalk Auto Group, a chain of luxury automobile dealerships in Texas, comprising Porsche, Audi, Volkswagen, Ferrari, Maserati and Lamborghini.  Ginsburg recently expanded his auto empire by acquiring a Ferrari/Maserati dealership in San Francsico, CA.  Under Ginsburg's direction, Boardwalk Auto Group has flourished, and is one of the fastest growing privately held companies in Dallas-Fort Worth.  Ginsburg has also spent considerable time serving on the boards of directors of the Dallas Symphony, the Dallas Arboretum, and various private schools.

54.     With its higher margin HD business taking off, the economy beginning to recover from the recession of 2008-2009 and companies again ramping up their advertising, DG somewhat insulated from competition by its diverse client base (which would cushion DG's revenues from account defections to competitors), and the fall of 2010 offering lucrative advertising opportunities from the upcoming political elections, the time was right for Ginsburg – increasingly focused on his other business and social interests – to divest out of DG while its stock price was at all-time highs.

55.     CW3 is a former Client Manager who worked at DG from April 2004 through June 2010.  CW3 observed that during the first half of 2010, Ginsburg was very involved with his other business, especially the Boardwalk Auto Group, and was "trying to take himself out," *i.e.*, to divest out of DG.   In addition to his involvement in other business, Ginsburg made extremely large real estate purchases.  In June, 2010 Ginsburg purchased two personal properties in Dallas, paying over $11 million dollars for one of the houses, known at the time as "the biggest, most expensive spec [sic] home ever built." *See* http://dallasdirt.dmagazine.com/2010/06/24/whos-having-a-31-million-dollar-week/.

56.     Ginsburg, however, was fully aware as CEO that DG was facing increasing competitive pressure.  Ginsburg only had a finite amount of time to capitalize on the situation, before competition would drive DG's margins, revenues – and stock price – down.  Ginsburg could not have failed to notice that analysts and the market were also becoming aware of the increased competitive threat.[4]  Ginsburg had, therefore, every motivation to downplay competitive threats and keep DG's stock price inflated for as long as possible, in order to divest as much of his shares, at top prices, as possible.

57.     Ginsburg began unloading his shares in late 2009 and continued to do so through August 2, 2010.  The bulk of these shares were sold when DG's stock price was at all-time highs, through early June 2010.  By August 2, 2010 Ginsburg had sold an astounding 1.1 million shares, for total proceeds of over $ 55 million  – over 35% of his total holdings, including 651,826 shares (or over 4% of the Company's shares then outstanding) that Ginsburg indirectly held, and which he sold through his Moon Doggie Family Partnership family trust (at $31.50/share) in the Company's April 2010 secondary offering:

| Filer Name | Direct Indirect | Number of Shares | Transaction Type | Price | Transaction Value | Transaction Date |
|---|---|---|---|---|---|---|
| Ginsburg, Scott K. | D | 75,000 | Sale | $27.78 | $2,083,500.00 | 12/15/09 |
| Ginsburg, Scott K. | I | -300,852 | Conversion | $10.00 | -$3,008,520.00 | 2/18/10 |
| Ginsburg, Scott K. | D | -350,973 | Conversion | $10.00 | -$3,509,730.00 | 2/18/10 |
| Ginsburg, Scott K. | D | 200,000 | Sale | $32.51 | $6,502,000.00 | 2/19/10 |
| Ginsburg, Scott K. | D | 42,434 | Sale | $31.98 | $1,357,039.32 | 2/22/10 |
| Ginsburg, Scott K. | D | 81,100 | Sale | $32.52 | $2,637,372.00 | 2/26/10 |
| Ginsburg, Scott K. | D | 27,439 | Sale | $32.52 | $892,316.28 | 3/1/10 |

---

[4] Ginsburg was so worried about competition driving down the stock price that he caused DG to sue Karen Dealy ("Dealy"), former Senior Vice President of Affiliate Relations at DG, when Dealy left in August, 2010 to join Yangaroo, a much smaller company.  *See DG Fastchannel, Inc. v. Dealy*, No. 10-12232 (Tex. Dist. Ct., 134th Dist.). During his deposition, Ginsburg's testimony demonstrated his overarching concern about the "competitive environment" during the Class Period.  Dealy's departure to a competitor during the Class Period was , according to Ginsburg, a contributing factor to depressing the Company's stock price in August 2010 – something Ginsburg was trying at all costs to avoid before and during the Class Period.

| | | | | | | |
|---|---|---|---|---|---|---|
| Ginsburg, Scott K. | I | 152,500 | Sale | $32.62 | $4,974,550.00 | 3/2/10 |
| Ginsburg, Scott K. | I | 122,500 | Sale | $32.62 | $3,995,950.00 | 3/5/10 |
| Ginsburg, Scott K. | I | 17,013 | Sale | $33.53 | $570,445.89 | 3/9/10 |
| Ginsburg, Scott K. | I | 651,826 | Sale | $31.50 | $20,532,519.00 | 4/13/10 |
| Ginsburg, Scott K. | D | 200,000 | Sale | $43.01 | $8,602,000.00 | 5/27/10 |
| Ginsburg, Scott K. | D | 176,100 | Sale | $42.63 | $7,507,143.00 | 5/28/10 |
| Ginsburg, Scott K. | D | 23,900 | Sale | $43.10 | $1,030,090.00 | 6/1/10 |
| Ginsburg, Scott K. | D | 42,498 | Sale | $38.13 | $1,620,448.74 | 8/2/10 |
| **Total** | | **1,160,485** | | | **$55,787,124.23** | |

58.     Because Ginsburg wanted to divest himself of as many shares as possible, at as large a profit as possible while DG's stock was still high, he did not adopt and trade under a 10b5-1 trading plan, even though his enormous sales caused analysts to question him.  On the Company's August 4, 2010 earnings call Ginsburg stated:

> Your second question about how I would go about selling additional stock, we're going to look at a number of factors on that. You asked if I'd use a 10b1, I think?

> **Jason Helfstein - Oppenheimer & Company - Analyst**

> Correct. In other words, it takes the -- other companies do it. And those that we cover that seem to do it don't seem to get nearly as much attention as you do. So just wanted to get your thoughts.

> **Scott Ginsburg - DG FastChannel, Inc. - Chairman, CEO**

> Sure. I think that's a good suggestion. I don't have -- I don't have any specific plan to put in place as of today, but it would be something that may well make a whole lot of sense. There's a series of actions that can make a whole lot of sense that we're beginning to look at.

**DG Loses Market Share and, Unbeknownst to the Market, Experiences a Slowdown in Sales in July 2010**

59.     According to John Roland ("Roland"), the former CEO of FastChannel before it was acquired by DG, and the current CEO of Extreme Reach ("ER") (one of DG's main competitors), DG lost several blue chip advertising customers to Extreme Reach in the first half of 2010 – specifically, Coca-Cola, Sears and Ford in April, May and June respectively.  Roland

confirmed that *all* of ER's current customers had defected from DG, and noted that ER had

successfully taken over 300 of DG's former customers.  According to Roland, ER's revenues

increased exponentially over the year, reflecting its gain in market share at DG's expense – in

January 2010 ER was bringing in about $150,000, by March it had doubled to $300,000, by

September $700,000 and by November $1.2 million – all revenue that came, at DG's expense,

from DG's former customers.  Roland estimated ER's 2010 revenue at $7 million, with ER

projecting $20 million in revenue for fiscal 2011.  The following chart lists some of the

customers now at ER, who were all formerly DG customers:



60.     According to CW2, Ford left DG for ER because of a more competitive pricing

structure.  The "cloud" delivery method allowed ER and other competitors to undercut DG's

pricing.  CW4, a former Client Manager at DG from 2005 through June 2010, until CW4 left to

join Extreme Reach, noted that DG has 400-500 employees, whereas as Extreme Reach employs

only 50-60 employees.  With only a tenth of the employees and much lower overhead, ER was further able to offer much lower delivery prices.

61.     CW2 observed that in the first half of 2010, it became apparent at DG that customer losses and a downward trend in revenue were imminent, stating that "revenue was being generated but was not sustainable."  CW2 explained that with the emergence of competitors such as ER, DG was being forced to lower prices, and many of its prime customers were defecting.  This was particularly evident with automobile and food/beverage companies.  CW2 cited General Motors as an example of a DG customer that had been hit hard by the recession and substantially cut back their advertising budget as a result.  According to CW2, customers like GM that were limited by a tight advertising budget were beginning to explore other vendors to deliver advertisements, in a search for better pricing.  During CW2's tenure, CW2 witnessed DG being forced to "adjust to the marketplace" by slashing prices.  CW2 stated that, depending on negotiations, DG was forced to give discounts of as much as 50%.

62.     CW2 observed that the "premium rates" DG was able to command as a "quasi monopoly" were no longer sustainable as competitors emerged, and as a result, DG was rapidly losing "significant accounts."  According to CW2, the loss of Coca-Cola, Ford, and other blue-chip customers demonstrated that DG's competitors could handle large accounts, and signaled to DG's remaining customers that other companies besides DG were able to handle their ad deliveries.  CW2 named Extreme Reach, Yangaroo, Hula and Ascent Media as the major competitors threatening DG's customer base.  CW2 heard from sales personnel in other regions that, in addition to the automobile industry, customers in the movie industry were also abandoning DG's premium pricing for the better price points offered by DG's competitors.

63.     Although the customer losses in the first half of 2010 were relatively small in terms of DG's overall volume, CW2 noted the account defections were "powerful signs" that resonated within DG, and especially with the more senior executives.

64.     Confirming CW2's observations, CW4 stated that Extreme Reach has recently taken over many of DG's large customers including Sears in the summer of 2010. CW4 referred to large accounts such as Sears and Coca-Cola as "long-term" customers, and noted that because there are relatively few companies in the ad delivery business, account defections by these long-term customers sets a trend for other customers.

65.     Compounding DG's accelerating loss of market share to competitors was a slowdown in sales within the automobile and entertainment industries in July 2010. A September 7, 2010 Craig-Hallum analyst report confirmed: "In July, auto sector advertising dropped sharply after the strong volumes in Q2 and theatrical advertising was also sharply lower as studios apparently did not chase a lackluster consumer response to a slow summer release schedule." Analysts and the market, however, did not have the visibility in July 2010 that Defendants did, as a result of DG's real-time tracking. Thus, the market learned of the slowdown only later, after the end of the Class Period.

**Defendants Know Revenues in the Third Quarter 2010 Will Drop**

66.     Because DG recorded revenue each time an ad was delivered, Defendants were able to, and did, track revenues on a real time basis, giving them very good visibility into the Company's quarterly performance.

67.     Roland confirmed that in the industry, each transaction/delivery is tracked in "real-time." According to Roland, this gave companies like ER and DG complete visibility throughout the quarter, and emphasized that this tracking gave senior level executives particular insight into sales trends.

68.     CW5 is a former Vice President-Finance and Strategy who worked at DG from October 2008 through May 15, 2010, reporting directly to Choucair.  According to CW5, DG's accounting department was based in Texas and managed by Choucair.

69.     CW6, is a former Billing Analyst who worked at DG's corporate office from March 2008 through April 2010.  According to CW6, Choucair had access to all of Company's billing and customer accounts.

70.     According to CW1, the Company generated more then 500 types of reports that were circulated to "C-level" executives on a *daily* basis.  CW1 stated that these reports, which were generated using the Company's SSRS software, were circulated everyday to the entire executive team including the Individual Defendants, and their delivery was "scheduled."  CW1 explained that the daily report was broken down into three categories:  spots (*i.e.*, commercials), deliveries, and orders (both SD and HD).  CW1 further stated that internal trend analysis reports were also circulated regularly.  CW1 noted that the Company's extensive reporting system made it impossible for any unpredictability regarding the Company's internal figures because the reports were circulated daily to C-Level management.  According to CW1, no transaction over $700 could go through without Choucair's approval.  CW1 recalled that on one occasion Choucair called CW1 to ask if the SSRS system was down, because Choucair had been unable to access the daily reports that day. CW1 observed that DG did not have department heads – instead, Choucair and Nguyen managed every aspect of DG's business.

71.     Thus, by early August, more than a month into the quarter, Defendants knew that the third quarter was going to be much worse than the market expected.

72.     DG's usual practice was not to give financial guidance, but to endorse analysts' consensus estimates.  Since 2008, DG's quarterly revenues had historically increased through the

calendar year so that Q1 < Q2 < Q3 < Q4, and analysts covering the company thus had every

reason to believe 2010 would follow this historical trend, in the absence of any statement to the

contrary by Defendants:



73.     Defendants knew from real-time tracking and daily reports, however, that July

sales and revenues were going to be much lower than analysts had expected – information the

market would not have until months later.  In addition, Defendants knew that DG's customers

were beginning to migrate to cloud-based competitors like Extreme Reach in search of lower

prices, and that DG would not be able to sustain the premium prices it once commanded.

Despite this knowledge, Defendants misleadingly told investors that DG's third quarter was

going to be "robust," and Ginsburg continued to unload shares by the thousands.

## DEFENDANTS' MATERIALLY
## FALSE AND MISLEADING STATEMENTS AND OMISSIONS

1.     **The August 4, 2010 Press Release**

74.     On August 4, 2010 the Company issued a glowing press release touting its second

quarter (which ended on June 30) earnings:

> Consolidated revenue for the second quarter 2010 increased 38%
> to $60.3 million compared to $43.7 million in the same period of
> 2009. Second quarter Adjusted EBITDA increased 67% to $28.1
> million compared to $16.8 million for the same period of 2009.
>
> ***
>
> "*The Company's revenue, margins, earnings and net debt show
> marked improvements during the second quarter.*" said Scott
> Ginsburg, Chairman and CEO of DG FastChannel.  "*The Company
> continues to execute on its strategic business plan.*"
>
> ***
>
> Mr. Ginsburg concluded, "Another quarter of dynamic revenue
> growth and the retirement of all outstanding debt have
> substantially improved the Company's financial strength.  Robust
> free cash flow and improved financial flexibility position DG
> FastChannel favorably to capitalize on opportunities that will allow
> us to better serve our customers, support our strategic initiatives
> and add value for our shareholders."

Emphasis added.

75.     This statement was materially false and misleading because Defendants failed to

inform the market that DG's third quarter revenues were going to be much lower than those

generated in the second quarter and below what analysts who followed the Company expected.

By this time, the Defendants knew, or were reckless in not knowing, from their real-time

tracking of DG's sales that a slowdown in spending in the automobile and entertainment

industries, as well as a growing loss of market share to competitors coupled with a forced need to

slash prices would result in significantly lower revenues than those analysts were expecting.

Defendants misleadingly omitted this information, instead touting DG's high revenues for the

second quarter and leading analysts to believe the Company was well positioned for an upswing

for the rest of the year, especially heading into the fall, which was expected to bring in more

advertising dollars from political campaigning.

> 2. **The August 4, 2010 2Q Earnings Call**

76.     The Defendants continued to mislead the market during the second quarter

earnings call.  Nguyen touted the Company's "outstanding" performance in the first half of 2010,

while failing to inform the market of the inevitable and – to the market – unexpected financial

downturn in the third quarter:

> 77.   **Neil Nguyen - DG FastChannel, Inc. - Pres., COO**
>
> Thanks, Scott. The Company remains focused on executing its
> operational plan and on delivering solid financial results
> throughout its businesses. DG FastChannel's revenue for Q-2 2010
> was $60.3 million, an increase of 38% over the second quarter of
> 2009. Our adjusted EBITDA totaled $28.1 million representing a
> 67% increase for the quarter. Diluted Earnings Per Share was
> $0.32 for the second quarter up 100% from the second quarter of
> 2009. *The Company posted exceptional results in our HD
> advertising revenue, growing the service offering by 99% to $23.9
> million in Q-2 of 2010. As these results demonstrate, the Company
> reported outstanding second quarter performance. We are very
> pleased with the Company's performance through the first half of
> the year*.

Emphasis added.

78.     On the same call, Ginsburg also emphasized DG's financial performance in the

first half of the year and fanned analysts' expectations about the Company's financial

performance for the balance of the year, without informing the market that he knew third quarter

results were going to be much lower:

> **Scott Ginsburg - DG FastChannel, Inc. - Chairman, CEO**
>
> Thank you, Omar.  Overall we are extremely pleased with our
> performance for the second quarter year to date in 2010. Our
> efforts to maintain and expand our leadership position in the

market is supported by key investments in personnel, technology, infrastructure, and as we look at the market place and *as we look at the balance of this year we continue to see these investments leading to our future success*. As you continue to follow our results for the year 2010, you might consider the following – 2010 has been a better year for advertising than 2009 *and will continue to be* according to all the people who look at this, the sooth sayers who look at where we are in 2010, and *as we look at the balance of the year we would look at continuing positive results from the markets, the video markets.* Second, we know that TV spot advertising demand has rebounded from 2009 levels. We look at up front acquisitions in the TV network market. We look at cable, we look at broadcast TV, we look at both national and scatter markets, and *they look very healthy at this time*. Next, as you know this is a mid-term election and both for issue advertising and political advertising DG FastChannel represents the gold standard and we expect to get more than our fair share of that particular vertical. Finally, the adoption curve for HD advertising continues to increase. *We expect our revenues and deliveries to improve throughout the year as well as our standard definition business as well. We have a robust business and expect it to continue for the balance of this year and in future periods*.

Emphasis added.

79.     Ginsburg further inflated analysts' expectations regarding the upcoming financial periods, stressing that DG still had a lot of room to expand in the HD market:

**Richard Ingrassia - ROTH Capital Partners - Analyst**

Okay. But to your knowledge, I mean, how many of stations with the HD (inaudible) or percentage are broadcasting in HD, fully upgraded work flow wise?

**Neil Nguyen - DG FastChannel, Inc. - Pres., COO**

I don't have that number off the top of my head here, Rich. I'll follow up with you.

**Scott Ginsburg - DG FastChannel, Inc. - Chairman, CEO**

Yeah, Rich, as we look at our particular vertical in HD, we think we have arrived in many instances. *But that if you look at our overall traffic numbers and so forth and how we're doing there, we're still very early on in the process. Extremely early on. And our volume continues to be robust in the sense that I've used that*

> *word two or three times today but it continues to be all headed in the right direction. But it's still a fragment of our business. And we have huge head room yet to come in future periods.*

Emphasis added.

80. Ginsburg, when asked directly about third quarter performance to date,

misleadingly said it was "robust":

**Hamed Khorsand - BWS Financial - Analyst**

Good morning, guys. Just a couple questions here. One is just looking **at how Q-3 is tracking, does it look better or the same as the Q-2**?

**Scott Ginsburg - DG FastChannel, Inc. - Chairman, CEO**

I think it's a little early in the quarter to give a firm up or down on that. *But I must tell you that **our perspective on Q-3 is very positive**. We think that it's going to do well. We gave some of those reasons earlier both in terms of the robust advertising environment, the political, our Internet business doing well.* ***So all of the signs at this point in the quarter indicate that we will have a – I can't use the word – I don't want to use the word "similar" but I want to use the word very robust quarter. And we expect that we'll do extremely well***.

Emphasis added.

81. On the same call, Ginsburg also repeated that the Company's practice was to

endorse analysts' estimates if management felt "comfortable" with them:

**Hamed Khorsand - BWS Financial - Analyst**

Well, last year you provided a projection or target that you wanted to achieve last year in HD revenues.

**Scott Ginsburg - DG FastChannel, Inc. - Chairman, CEO**

We gave an annual number. We didn't give a quarter.

**Hamed Khorsand - BWS Financial - Analyst**

Yes. (Overlapping Speakers).

**Scott Ginsburg - DG FastChannel, Inc. - Chairman, CEO**

I don't think we've actually sat down and looked at it and split it up that way. *In terms of guidance, for the year to date we said, if I recall correctly and Omar can correct me, I think we've said that we have decided that it would be best for us to instead of being the predictor of the future to look at the numbers that have been provided and to say that we felt comfortable that we could meet the projections then the consensus projections that are out there for the Company. **And we continue to believe that, by the way***.

Emphasis added.

82.     Ginsburg also misleadingly stressed that market conditions were good, even though he knew the Company was experiencing a marked slowdown in sales in both the automotive and entertainment industries:

**Scott Ginsburg - DG FastChannel, Inc. - Chairman, CEO**

Well, the number of units that are actually being sent in HD have increased significantly year-over-year. (Overlapping Speakers).

Like a percentage of the volume. It hasn't moved as much as you might otherwise expect.

**Carter Malloy - Stephens Inc. - Analyst**

So in other words, standard def volumes, that's surprising, but the standard def has actually grown in percent volume it's grown faster than HD has in the last year just on an overall TV rebound.

**Scott Ginsburg - DG FastChannel, Inc. - Chairman, CEO**

Well, that makes sense. As you remember we were in the middle of a pretty significant headwind. *Many of the markets, particularly the smaller markets were being cut out of advertising campaigns. If you go back a year or so ago and you look at all the TV groups and see how they were performing, most of them were trading almost at an option price. And they've come back significantly. The amount of equity in the TV broadcasting sector has gone up significantly. So what that would tell you is that the market is back*, and as a result of that many of the -- much of the volume that increases that we're experiencing can easily be determined by looking at the TV broadcasting.

Emphasis added.

83.     These statements made by the Individual Defendants on the Company's 2Q earnings call were false and misleading because by emphasizing that (1) the Company reported better-than-expected financial performance in the first half of 2010; (2) the market remained strong; (2) there was much more room to expand in the lucrative HD market; (3) the third quarter was looking "robust"; and (4) the Company would continue its practice of endorsing analysts' estimates when it was "comfortable" with them, Defendants intended to mislead the market into believing that DG's third quarter would be as strong as, if not stronger, than the second quarter, when the opposite was true.  Defendants knew, or were reckless in not knowing, that the Company's trend analyses and real-time sales tracking indicated that a combination of loss of market share to competitors, a need to cut prices in an effort to retain accounts, and a slowdown in ad spending in the automotive and entertainment industries would result in a much poorer third quarter.

**Analysts Raise Estimates in Reaction to Defendants' Misstatements**

84.     As they had after DG released its first quarter results in May, analysts immediately raised their estimates for DG's third quarter after the Company released its impressive second quarter results and its report on the Company's third quarter performance to date.

85.     An August 5, 2010 Craig-Hallum report raised estimates for the third quarter, citing the Company's strong performance in the second quarter:

> *Another huge quarter*: Q2 revs, EBITDA, Adj. EPS *again beat our/consensus estimates by a substantial amount*: Q2 revs of $60.3M were up 38% y/y, well above our $55.3M estimate and consensus of $55.6M. Adj EBITDA came in at $28.1M versus our estimate of $24.2M and adj EPS of $0.49 beat our estimate by $0.08….*Raising rev and earnings estimates again*. Incremental margins on DGIT's largely fixed cost platform are extremely high. Excluding $3M in legal fees in the first half and costs associated with the rich media business, total costs have barely budged with

significantly high volumes. *We are again increasing rev & earnings estimates for 2010 and 2011*, (shown on the left), which may prove conservative if HD ad penetration accelerates above our end of year 2011 target of 15%.

Emphasis added.

86.     An August 5, 2010 Merriman report also raised estimates, and highlights

Defendants' failure to inform the market of the July slowdown in automotive and entertainment

ad spending:

> We reiterate our Buy rating on DGIT; *we raised our estimates* and maintained our valuation range of $50-55. *2Q10 results were well ahead of expectations*, driven by a continued mix shift toward HD format TV ads (up 99% Y/Y), *and also by a broad recovery in TV ad budgets which lifted the overall volume of ad deliveries by an estimated 20% Y/Y. This was lead by a rebound in the automotive sector and strength in film/entertainment sector*.

Emphasis added.

87.     An August 5, 2010 Oppenheimer report also raised estimates:

> *Following better than expected 2Q results, we are raising our FY estimates and target, driven by continued business momentum....Raising '10 and '11 estimates.* We are raising our '10/'11 revenue estimates by 6% and 7%, EBITDA by 12% and 6% and non-GAAP EPS by 15% and 8%, respectively. We see possible upside to these estimates given our estimated reduction in 2H10 gross margins. We expect '11 to benefit from station investments in HD assets.

Emphasis added.

88.     An August 5, 2010 Roth report followed suit and raised estimates:

> *June results well ahead of expectations*.  DG FastChannel reported 2Q10 revenue of $60.3M, up 38% Y/Y and 8.5% above consensus of $55.6M. HD revenue of $23.9M increased 99% Y/Y and topped our estimate of $20.8M.
>
>                             ***
>
> *An industry-wide rebound in broadcast advertising*, witnessed by an estimated 20% Y/Y increase in upfront spending commitments in May, continues to spur 10%-15% Y/Y growth in commercial

> production and therefore overall ad volume at DG FastChannel.
> *We expect this trend will continue throughout 2H10, fueled further*
> *by political advertising, including issue-based ads. Notably, the*
> *marketing categories showing the strongest Y/Y spending surge*
> *(auto, consumer goods and entertainment, according to Nielsen)*
> are also DG's leading HD client categories, suggesting that the mix
> of HD shipment volumes will continue to grow in 2H10.

Emphasis added.

89.     An August 5, 2010 ThinkEquity report also raised estimates and reflected

Defendants' failure to inform the market of the Company's need to cut prices in an effort to

retain customers:

> *DGIT reported a strong Q2, handily exceeding our estimates and*
> *consensus on the top and bottom lines*, based on HD advertising's
> continuing ramp and a strong rebound in total ad delivery volumes
> from 2Q09 levels….*The company continues to benefit from the HD*
> *advertising shift, a strong rebound in total ad delivery volumes,*
> *and political advertising* ($1.2M in the quarter). HD advertising
> revenue increased 99% Y/Y to $23.9M, and now represents 40%
> of total revenue (versus 7-8% of total ad delivery
> volume)….*Management commentary continues to indicate*
> *relatively benign competitive dynamics and price stability.*

Emphasis added.

90.     An August 4, 2010 BWS analyst report also highlights the Defendants'

misleading omission regarding the July slowdown in automotive ad spending:

> DG FastChannel (DGIT- Buy Rating) reported second quarter
> results ahead of expectations on the heels of an increase in demand
> for TV spot advertising. DGIT reported revenue of $60.3 million
> with EBITDA of $28.1 million. The EBITDA margin was up 10
> percent sequentially and sets up the possibility of DGIT achieving
> 50 percent EBITDA margin by the end of the year. The second
> quarter is usually a soft bounce from the first quarter. This year the
> rebound in advertising seems to be tracking better than in prior
> years. *The ramp in TV advertisements should allow DGIT to report*
> *sequential increases in revenue for the remainder of the year*. The
> second half of the year is usually the period when advertisers start
> their marketing campaigns, some of it attributed to back to school.
> *For the auto industry, the third quarter is when the new car models*
> *are introduced.*

31

Emphasis added.

     **3.**     **The August 10, 2010 Oppenheimer Investor Conference**

91.     The Defendants failed to "correct" the analysts' raised estimates following their false and misleading statements and omissions on the August 4, 2010 earnings call, and their omissions misled the market into believing that they had endorsed those raised estimates, per their usual practice and stated intent to do so as long as they were "comfortable" with the analysts' estimates. At an investor conference almost a week after the earnings call, the Defendants again refused the opportunity to correct analysts' estimates.

92.     At the conference, Ginsburg falsely reassured investors that the Company continued to enjoy good relationships with its customers, even though he knew that several blue-chip customers including Ford and Coca-Cola had already defected to ER, and feared even more customers would follow the trend:

> Investment highlights we're the dominant player in the North American advertising services market, positioned to deliver ads across both traditional and online media. *We have a very good long-term relationship across our blue chip customer base*. We have a technology leadership via our proprietary business-to-business digital platform, coupled with a world-class operating infrastructure. *Our growth trends, which I'll show in a moment, are highly positive* and our free cash flow and balance sheet are stellar….For the first two quarters of this year, as you can see, our revenue year-over-year has increased substantially, 38% increase for the second quarter and 34% increase for the first two quarters of the year, with our EBITDA going in quarter two 67% up to 28 million and for the year at 69% increase growing to $52 plus million.

Emphasis added.

93.     Nguyen added that there was still a lot of room to grow in the HD market and emphasized the HD growth in the second quarter, while failing to inform the market of the third quarter downturn the Defendants knew was already underway:

> So the mix of our business as you can see at the bottom is roughly about 6, 7% of our business is in the HD and while the majority of that's still in SD. So early on adoption, still lot of room for growth. Our revenues for HD grew exceptionally well from Q1 to Q2 and year-over-year.

94.    Ginsburg further admitted that there was good visibility in the industry (terming it "noise in a vertical" in industry parlance), but failed to inform the market about the July slowdown in sales that the Defendants already knew about:

> [W]e have, as Neil said, 18 offices and almost 800 people, all committed to growing this business *and taking advantage of the bump that comes with each presidential year and it's coming with the move towards HD and towards digital online broadcasting.* So we have done our part. *We will continue to do our part to manage the business as we have for the past 22 quarters. We see the future still extremely bright. When there is a lot of noise in a vertical such as ours we're one-on-one as you all know.* It's a concern to people as how fast can you buy it, what's going to be your volume, what's going to happen to your pricing.

Emphasis added.

95.    Nguyen also addressed customer relationships but misleadingly omitted the loss of market share to competitors like ER:

> **Analyst**
>
> And how much this competition enter into the cost discussion... the pricing discussion?
>
> **Neil Nguyen, President & Chief Operating Officer**
>
> I think it varies. I think the RPs that we went out to market, the company has done really well. *Overall, we renewed a number of our contracts with each one of our major advertisers and continue to have support from all the top agencies and advertisers.*

Emphasis added.

96.    These statements were false and misleading because Defendants knew, or were reckless in not knowing, that the third quarter financials were going to be much lower than what analysts expected – halfway into the third quarter by this time, the Defendants' tracking showed

them that because of the July sales slowdown, and price-wars with competitors, the third quarter

could not possibly perform as well as the analysts' estimates, which had been raised immediately

following Defendants' statements on August 4, 2010.

**DG's stock price fails to rebound on market fears of competition**

97.     DG's stock price remained sensitive to competitors' announcements, despite

Defendants' misstatements and omissions.

98.     An August 10, 2010 Roth report noted the reaction of DG's stock price to an

announcement by Ascent Media, one of its main competitors:

> Based on our assessment of Ascent Media's Javelin service from
> both the broadcaster and ad client perspective, we believe investors
> are overreacting to the potential threat to DG FastChannel's market
> share and margins.
>
> *Yesterday DGIT shares declined ~7.5% on heavy volume after
> Ascent management (on their quarterly earnings call) announced
> the imminent launch of Javelin for spot ad delivery.* Javelin
> complements Ascent's recently upgraded/re-branded Pitch Blue
> service for syndicated HDTV. Both services are a collaborative
> venture from Ascent, Time Warner (GDMX division of Warner
> Bros.) and CBS.  *In addition to the likely loss of Ascent and
> Warner Bros. as clients, the potential risk to DG FastChannel is
> that in an effort to win clients, Ascent Media may offer Javelin at
> prices well below profitability, initiating a price war with DG that
> will slow growth.*

Emphasis added.

99.     Defendants again failed to take the opportunity to inform the market that DG was

already engaged in price wars with competitors, and – coupled with a sales slowdown in July –

third quarter revenues would be markedly lower.  Ginsburg, notably, refrained from selling any

more shares in August at DG's relatively lower stock price.

100.     By the end of August, however, with the end of the third quarter rapidly

approaching, Defendants had failed to inflate DG's stock price to where Ginsburg wanted it, and

Defendants knew they could no longer hope for a miraculous increase in revenue to offset slow

July sales.  Defendants tried to blunt the impact of the truth with a "pre-announcement."

**The Truth is Revealed – DG Sharply Reduces Guidance**

**The August 30, 2010 Press Release**

101.    On August 30, 2010, Defendants stunned the market by sharply reducing

guidance to well below analysts' estimates, which had been raised only a few weeks before.  In

an attempt to soften the impact of the revised guidance, Defendants released it as a "pre-

announcement" to third quarter earnings, and further tried to blunt the impact by simultaneously

announcing a $30 million stock buyback (7% of shares then outstanding), even though the

Company had conducted a secondary stock offering as recently as April, 2010:

> DG FastChannel, Inc. (NASDAQ:DGIT), a leading provider of
> digital media services to the advertising, entertainment and
> broadcast industries, today announced that its Board of Directors
> has approved a $30 million stock repurchase program authorizing
> the Company to purchase up to $30 million of its common
> stock….*Separately, the company provided a financial outlook for
> the third quarter and full year 2010.  For the three months ended
> September 30, 2010, the Company expects revenues of $51-53
> million and EBITDA of $23-24 million.   For the full year the
> Company is comfortable with revenues of approximately $230 to
> $234 million and EBITDA of approximately $105 to $107 million.*
>
> \*\*\*
>
> Mr. Ginsburg commented, "While DG FastChannel's pricing has
> remained stable and the HD business is strong, we are seeing
> normal seasonality in our SD volumes following a particularly
> strong Q2.  This seasonality is being exaggerated by the strong
> rebound in spending from the second to third quarter in 2009,
> which masked the normal seasonality.  In addition, the shift in our
> customer mix as we transition the Company's Pathfire long-form
> platform from a wholesale to a full service business model has put
> short term pressure on revenues, but we expect that our new
> customer acquisitions will start to contribute in the fourth quarter.
> We remain confident that for the full year 2010, the Company
> expects to report approximately 22% year-over-year revenue
> growth and approximately 36% EBITDA growth, " he concluded.

Emphasis added.

102.   Defendants' revised guidance represented a stark downward departure from

previous analysts' estimates:

|  | Guidance | | Consensus | |
|---|---|---|---|---|
|  | 3Q10 (E) | FY10(E) | 3Q10 (E) | 3Q10 (E) |
| Revenue | $51-53M | $230-234M | $61.5M | $246.2M |
| EBITDA | $23-24M | $105-107M | $29M | $115.2M |

103.   The market reacted to the revised guidance by sending DG's stock price

plummeting 38.43% on unusually heavy trading volume, with 25,894,600 million shares traded

compared with an average daily trading volume over the Class Period of 1,187,100 shares:



104.   Analysts were shocked by the Defendants' abrupt change of course, when earlier

in the same month they had been effusive about DG's prospects for the third quarter.

105.    An August 30, 2010 BWS report stated BWS was dropping coverage of DG, and

noted that only a week prior to the announcement, Choucair was still insisting business was

strong:

> We have decided to drop coverage of DG FastChannel (DGIT- No
> Rating) and move on to other ideas. *The Company issued earnings
> guidance for the third quarter and full year which are materially
> lower than consensus estimates....****We had spoken with CFO
> Omar Choucair early last week when Mr. Choucair was adamant
> about business conditions  remaining strong****.

Emphasis added.

106.    An August 31, 2010 Craig-Hallum report also expressed surprise that the revised

guidance followed so soon after a flowing report from Defendants:

> Adjusting rating and estimates following a disappointing pre-
> release. *We are lowering our rating and price target after DGIT
> guided revenues and EBITDA well below our estimates for 3Q and
> FY10* (see above). We were relatively in-line with consensus. ***It is
> especially surprising to us that the company reported 2Q results
> in early August and has been positive in communications with
> the investment community since then***. Our new estimates are
> below guidance as we conservatively estimate steep declines in
> overall pricing based on rising competitive pressures.
>
> Commentary on guidance. Management gave the following
> reasons for lower than expected guidance: (1) seeing normal
> seasonality in SD volumes following a particularly strong 2Q,
> although we struggle to find historic negative seasonality between
> 2Q and 3Q (acquisitions cloud the analysis). (2) Shift in customer
> mix for Pathfire to a full service business model has put short term
> pressure on revenues. A competing delivery platform called Pitch
> Blue likely impacted revenues by ~$2M. (3) *We believe Extreme
> Reach, another competitor which delivers advertising content,
> impacted revenue by ~$1M as several blue-chip customers
> migrated from DGIT.* (4) To the positive, management indicated
> pricing has remained stable and the HD business is still strong,
> although our forward estimates anticipate significant price erosion
>
> Authorized a $30M stock buyback program. *In the release the
> company announced a $30M stock buyback program. The
> company raised >$110M in April from a secondary that was
> priced at $31.50 per share.*

> *With competitors showing surprising customer gains based on price coupled with the sharp and unexpected reduction in this year's guidance* from our previous estimates, we are lowering our 2010 & 2011 earnings estimates, our rating and our price target while we sort out DGIT's competitive position.

Emphasis added.

107.   An August 31, 2010 Merriman report observed the competitive landscape in-depth, demonstrating the actual competitive pressures DG had faced during the Class Period:

> DG issued 3Q10 and FY10 guidance well below our and consensus estimates, attributing that to seasonality and loss of revenue in the Pathfire segment to Ascent Media. *Separately, we learned that CBS and Warner Bros. have began to migrate their TV show deliveries onto Ascent Media's network.* DG claims to have won some business against Ascent Media as well, but those revenues will begin to flow after 3Q10. *We believe that the slowdown in 2H10 also reflects some competitive losses and pricing pressures in the ad delivery business, which could worsen in 2011.*
>
> ***
>
> Changing competitive landscape.
>
> *We have conducted a deep review of DG's competitive landscape with input from executives of Ascent Media, Extreme Reach, Hula Exchange Media, Syncro Services and PostAds Group, among others.* Our findings led to a change in our outlook for DG FastChannel as we now believe that 1) market share losses will accelerate in 2011, 2) barriers to entry have decreased, 3) pricing will likely decline at a faster-than-expected pace and 4) HD uptake could take longer-than-expected.
>
> ***
>
> Market share losses are likely to accelerate in 2011.
>
> *While Extreme Reach (ER) was just getting its foot in the door in 2010, its momentum is building. Meanwhile, Ascent Media is going to enter the market in September and could be a viable competitor in 2011. Also, a small but emerging player, Hula Exchange Media, appears to be taking some accounts away from DG as well, and we heard that some major brands are in the pipeline.*

*Having consolidated the marketplace, DG's customers seem to be yearning for alternatives to get competitive prices and customer service.*

*In recent months, there were big account defection to ER (Coke, Ford, Sears, Dell) which helped the company to establish its station coverage close to 80% of DG's. Though ER is still missing the top networks (NBC, ABC, Fox and CBS), management is confident it will sign at least three of the four by the end of 2010.* That would give it equivalent station coverage to DG, and with aggressive pricing and innovating workflow products, *we expect more account defections.*

By the end of 2010, we could also see Ascent Media evolve into a formidable competitor. Though its TV station coverage is only 30% of DG's, it has a massive cash hoard (over $300 million) to put against building its ad delivery network and a small foothold in the market (Filmcore division) with few marquee  accounts such as Nike, Toyota and Taco Bell. Also, through its post-production services, Ascent Media touches around 70% of the TV commercials produced in the U.S., according to our checks, which could be a good starting point for growing its ad delivery services. Since Ascent partnered with CBS and Warner Bros., it is reasonable to assume that Ascent should be able to migrate Warner Bros. (film studio) onto its ad network in 2011. We believe that Warner Bros. is currently a top 10 customer of DG.  *We have also heard that Hula Media Exchange (Hula MX) is gaining traction and could be signing two of the top ten U.S. advertisers by the end of 2010, and Radiance (run by Comcast Media) could become a factor in 2011, especially if Comcast's acquisition of NBC is approved. NBC owns Universal Studios, another big advertising account for DG.*

\*\*\*

Barriers to entry decreased.

With the cost of storage and bandwidth declining, and the advent of cloud computing/storage and Software as a Service (SaaS) models, the barriers to entry from a capital expenditures perspective have been lowered. ER and Hula MX software-only approach seems to be gaining traction.  DG's satellite-based delivery with a fleet of over 2,000 storage boxes at the premises of TV stations is well established, proven delivery method, but one that can be bypassed by Internet-based delivery.

\*\*\*

Pricing will likely decline at a faster-than-expected pace.

Our checks indicate that competitors of DG are significantly undercutting HD pricing. *On the low end, DG charges about $150 per delivery, we estimate (DG has a tiered pricing structure and could be as much as $400 on the high end), while its competition has won business with prices that are less than $100 per delivery, according to our checks. Moreover, its competition offers flat prices regardless of the delivery timing, which appeals to the customers, vs. DG's tiered pricing structure*. We believe that HD delivery prices could decline faster than we previously expected.

\*\*\*

History could repeat itself.

When SD delivery began in late 1990's, the price range was $75-100. When FastChannel entered the market in early 2000's, it came in with a rock bottom $10 price point, shattering the price levels for the rest of the competition, and shortly after that, SD prices settled in the $10-15 range.

\*\*\*

*Extreme Reach - the most imminent competitive threat - a repeat chapter in DG's history?*

*While Ascent Media is trying to replicate DG's delivery methods, we believe that the more serious competition could come from the SaaS– or cloud-based, software-only companies such as Extreme Reach and Hula MX.*

We spoke with the managements of these companies recently and believe that these are viable solutions are run by experienced managements.

Extreme Reach (ER) was established in late 2008, but got going in early 2009 and has gained good traction in 2010. *The company now has over 150 clients including Geico, Ford, Coca Cola and Sears K-Mart*, and it claims to be capable of delivering to 4,500 video destinations (local TV and network TV stations, cable systems). Although it currently does not cover the top four networks (NBC, ABC, CBS and Fox), the company believes that two of these will be on board within a month and another one in 4Q10. *Having signed Ford, Coca Cola and Sears K-Mart is likely helping ER break into these top networks*.

ER is run by former FastChannel executives; FastChannel was acquired by DG in May 2006 for about $30 million in stock and was on a $25 million revenue run rate and modestly EBITDA positive at the time. After DG acquired FastChannel, it extracted about $12 million in cost synergies, making it quite an accretive acquisition and eliminating a source of pricing pressure. *Based on our checks, FastChannel was among the fiercest, most aggressive competitors of DG in the past and ER is poised to repeat that again, with an improved business model (SaaS / cloud-based platform).*

ER's management stated that the company is on a $15 million revenue run rate in 2010, up from very little in 2009, and up from a $10 million run rate five months ago during our prior conversation with management. *The company recently raised $9 million from existing VCs and plans to expand its staff from 40 currently to 150 by year end.* In comparison, we estimate that short-form video delivery represents about 70% of total or $170 million in revenue in 2010 at DG.

The solution from Extreme Reach differs from the hardware-based platforms of DG and Ascent Media. DG and Ascent have deployed storage boxes at the premises of TV stations (DG has over 2,000 and Ascent about 900) and use satellite for delivery of the content. That is an efficient and proven solution when it comes to bandwidth costs and quality of service, we believe.

However, as Internet bandwidth and storage server costs declined, and security improved over the years, a number of applications and processes have migrated to the web. Hence the emergence of Software as a Service (SaaS) business models and, more recently, cloud computing/storage. These technology advents have lowered the barriers to entry from a capex standpoint, although knowledge of the industry's nuances, workflow processes, customer relationships, etc. still keep the hurdle relatively high. ER took advantage of these trends by launching a purely software-based solutions for ad delivery. The company built its solution to run in the cloud provided by Amazon's S3 and Nirvanix. Hence, it was able to avoid the initial capital outlays for hardware, but is of course paying for cloud usage, which on a variable cost basis may not be cheaper than the variable costs of hardware-based solutions from DG and Ascent.

*From a client's (agency, advertisers) perspective, the experience does not change much with ER. Their ads are uploaded into the cloud, where the company transcodes the files into appropriate formats for each TV station, conducts quality control, etc. The TV*

*stations are then notified that a TV commercial is available and they download it to their facilities.*

*From a broadcasters' standpoint, this requires their own storage and bandwidth capacity (which is normally provided by DG), although the cost of these are likely relatively small. The reality is, however, that it is the agencies/advertisers who pay for the bills, not the broadcasters, and thus if ER has customers, the broadcasters will eventually bow and adopt those solutions as well. And it appears that has happened* as ER claims to have 4,500 stations accepting its ads and management expects to have three of the top four networks live by end of 2010 as well.

***

Hula Media Exchange (Hula MX), another Internet-based competitor. Hula MX was launched by its parent company, FirstSpin, in January 2009.

The genesis of FirstSpin is in the delivery of radio ads, and Hula MX is the company's video delivery solution. Hula stands for Hardware-free Ultra Light Advertising. *The management of FirstSpin stated to us that it has signed over 250 clients for Hula MX, including many DG clients,* though not always capturing all of their deliveries, and believes that it will soon sign some of the top 10 advertisers as well.

One of the things that has helped Hula gain traction with broadcasters is that it developed a client-side software that allows for pushing of ads into TV stations, rather than relying entirely on the TV stations' staff to "pull" the add from Hula's cloud. That made the service more seamless for TV stations and Hula MX now claims to have over 3,500 stations reachable via its service.

*ER and Hula MX also assert that their software-only, cloud-based solutions allow them to integrate into advertisers' and broadcasters' workflows, customizing the video files to each TV stations' particular requirements, taking some burden off from their operations' staff.* The software solutions also give ER and Hula MX the potential ability to deliver video ads not only to TV stations, but also to web sites, mobile devices, close circuit TVs at stadiums, restaurants, etc.

Emphasis added.

## POST-CLASS PERIOD EVENTS

108.     On November 4, 2010 DG released third quarter results, which were significantly

below the Company's second quarter results -- $60.3 million in the second quarter, versus $56.9

million in the third quarter.  Moreover, Defendants again disguised the financial performance of

the Company's core ad delivery business by acquiring Match Point Media ("Match Point"), a

distributor of ads in the infomercial (or "direct response") market on October 1, 2010, and

adding Match Point's revenue to DG's own estimated revenue for the fourth quarter.  Choucair

confirmed this on the November 4, 2010 earnings call:

> Turning to the Q4 and full year 2010 outlook, which was included
> in the press release earlier this morning, the Company expects
> 2010 Q4 revenues to be approximately $67 million to $69 million
> and adjusted EBITDA to be approximately $29 million to $31
> million. For the full year 2010, the Company expects revenues of
> $238 million to $240 million and adjusted EBITDA of
> approximately $107 million to $109 million. *These estimates
> include the fourth quarter results from Match Point, which was
> acquired as of October 1, 2010.*

Emphasis added.

## CLASS ACTION ALLEGATIONS

109.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all purchasers of the securities of

DG between August 4, 2010 and August 27, 2010, inclusive, and who were damaged when the

truth about DG's business was disclosed.  Excluded from the Class are Defendants, the officers

and directors of the Company, at all relevant times, members of their immediate families and

their legal representatives, heirs, successors or assigns and any entity in which Defendants have

or had a controlling interest.

110.     The members of the Class are so numerous that joinder of all members is

impracticable.  Throughout the Class Period, DG had more than 28.4 million shares of  common

stock outstanding that traded on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by DG or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

111.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

112.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

113.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made (or omissions) by Defendants to the investing public during the Class Period misrepresented (or omitted) to state material facts about the business, operations and management of DG;

(c)     whether the Defendants made their misstatements or misrepresentations with the required scienter; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

114.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE AFFILIATED UTE DOCTRINE, AND/OR, IN THE ALTERNATIVE, THE FRAUD ON THE MARKET DOCTRINE

115.     Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against the Defendants are primarily predicated upon omissions of material fact which there was a duty to disclose.

116.     Lead Plaintiff is also entitled to a presumption of reliance because, as more fully alleged above, the Defendants failed to disclose material information regarding DG's sales and revenue decline and loss of market share, while misleadingly informing the market that business was "robust."

117.     Lead Plaintiff is entitled to a presumption of reliance under the fraud on the market doctrine of the Defendants' material misrepresentations and omissions, because at all relevant times, the market for DG's common stock was an efficient market for the following reasons, among others:

(a)     DG's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, DG filed periodic public reports with the SEC (and was eligible to file SEC Form S-1) and the NASDAQ;

45

(c)     DG regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     DG was followed by numerous investor research services that published publicly available reports, as well as by several securities analysts (including Hamed Khorsand at BWS Financial Inc; Richard Ingrassia and Jared Schramm at Roth Capital Partners; David B. Kestenbaum at Morgan Joseph & Co. Inc.; Mitchell Bartlett and George A. Kelly at Craig-Hallum Capital Group LLC; Richard Fetyko at Merriman Curhan Ford; Jason Helfstein and Anil Gupta at Oppenheimer & Co Inc.; and Jonathan Ruykhaver, Robert Coolbrith, and Aleksandr Zukin at ThinkEquity LLC) employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

118.    As a result of the foregoing, the market for DG's common stock promptly digested current information regarding DG from all publicly available sources and reflected such information in DG' stock price.  Under these circumstances, all purchasers of DG's common stock during the Class Period suffered similar injury through their purchase of DG's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

119.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to

46

differ materially from those in the purportedly forward-looking statements.  Further, most of the identified false and misleading statements and omissions herein are not forward looking statements, but are statements of current and historic fact regarding DG's revenues and sales, and its current business relationships.

120.    To the extent that any of the false and misleading statements identified herein are mixed statements of current fact and forward looking projection, the portion of those statements relating to current fact are not protected by the safe harbor.

121.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of DG who knew that those statements were false when made.

## LOSS CAUSATION/ECONOMIC LOSS

122.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and the Class.

123.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of DG' common stock by misrepresenting, or failing to disclose that: (1) DG was facing increasing competitive pressure in its core ad delivery business and was losing key clients to competitors such as Extreme Reach; (2) DG was suffering a marked decrease in sales and revenue in July 2010; and (3) as a result, the Company's endorsement of analysts' third quarter estimated revenues, despite its knowledge in July that those estimates were too high, was false and misleading.

124.    The truth about DG was revealed in a disclosure on August 30, 2010.  As a direct result of this  disclosure, the price of DG common stock dropped precipitously.  On August 30, 2010, when the Defendants admitted that they were expecting much lower revenues for the third quarter in 2010 than they had previously misled the market into believing, DG's stock price sank 38.43% on unusually heavy trading volume, with 25,894,600 million shares traded compared with an average daily trading volume over the Class Period of 1,187,100 shares.

### COUNT I

**Violation Of Section 10(b) Of
The Exchange Act And Rule 10b-5(b)
Promulgated Thereunder Against All Defendants**

125.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

126.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding DG's business, operations, management and the intrinsic value of DG's common stock; and (ii) cause Lead Plaintiff and other members of the Class to purchase common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

127.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for DG's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

128.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about DG's manufacturing capacity, as specified herein.

129.    The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of DG's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about DG and its business operations in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of DG's common stock during the Class Period.

130.    Each of the Individual Defendants' primary liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all

relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

131.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing DG's operating condition from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by Defendants' misstatements of the Company's business and operations throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

132.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of DG's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of DG's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired DG's securities during the Class Period at artificially high prices and were damaged when the value of

their securities declined upon disclosure of the truth about Defendants' false and misleading statements and omissions.

133.    At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth regarding DG's business and operations, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their DG's securities, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

134.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

135.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5(a) and (c)
### Promulgated Thereunder Against All Defendants

136.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

137.    This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c).  Accordingly, Lead Plaintiff need not allege in this Count nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

138.    During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Lead Plaintiff and the Class; (ii) artificially inflate the market price of DG's common stock; and (iii) cause Lead Plaintiffs to purchase DG's common stock at artificially inflated prices.

139.    In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiff and the Class in connection with their purchases of DGs' common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

140.    Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included the knowing and/or reckless suppression and concealment of information regarding DG's true capacity potential and profitability during the Class Period.

141.    Lead Plaintiff and the Class reasonably relied upon the integrity of the market in which DG's securities traded.

142.    During the Class Period, Lead Plaintiff and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct.  Had Lead Plaintiff and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased DG's securities, or if they had, would not have done so at the artificially inflated prices paid for such securities.

143.    As a direct and proximate result of Defendants' scheme to defraud and such
unlawful course of conduct, Lead Plaintiff and the Class suffered damages in connection with
their purchases of DG's common stock during the Class Period.

144.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange
Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Lead Plaintiff and the
Class for damages suffered in connection with their purchases of DG's securities during the
Class Period.

## COUNT III

### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

145.    Lead Plaintiff repeats and realleges each and every allegation contained above as
if fully set forth herein.

146.    The Individual Defendants acted as controlling persons of DG within the meaning
of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions,
and their ownership and contractual rights, participation in and/or awareness of the Company's
operations and/or intimate knowledge of the false statements filed by the Company with the SEC
and otherwise disseminated to the investing public, the Individual Defendants had the power to
influence and control and did influence and control, directly or indirectly, the decision-making of
the Company, including the content and dissemination of the various statements which Lead
Plaintiff contends are false and misleading.  The Individual Defendants were provided with or
had unlimited access to copies of the Company's reports, press releases, public filings and other
statements regarding DG's declining revenues and loss of advertising customers prior to and/or
shortly after these statements were issued and had the ability to prevent the issuance of the
statements or cause the statements to be corrected.

147.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

148.    As set forth above, DG violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as control persons of DG, the primary violator.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Labaton Sucharow LLP as Lead Counsel;

(b)    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED:   January 24, 2011

**LABATON SUCHAROW LLP**

By: *Jonathan Gardner* /AN

Christopher Keller
Jonathan Gardner
Mark S. Goldman
Angelina Nguyen
140 Broadway
New York, New York 10005
Tel: 212-907-0700
Fax: 212-818-0477

*Counsel for Lead Plaintiffs*

55

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE DG FASTCHANNEL, INC.          :     Case No. 10 Civ. 6523 (RJS)
SECURITIES LITIGATION               :
                                    :
                                    :
---

## CERTIFICATE OF SERVICE

I, Jonathan Gardner, hereby certify, that on January 24, 2011, I caused true and correct

copies of the Consolidated Amended Class Action Complaint to be served upon the following

parties by U.S. mail:

> Jeff G. Hammel
> Latham and Watkins (NY)
> 885 Third Avenue
> New York, NY 10022
>
> Kevin H. Metz
> Michele E. Rose
> Latham & Watkins LLP (DC)
> 555 Eleventh Street, NW
> Suite 1000
> Washington, DC 20004
>
> *Attorneys for Defendants DG Fastchannel, Inc.,*
> *Scott K. Ginsburg, Neil H. Nguyen, and Omar A. Choucair*

Jonathan Gardner